**In re KELLOGG BROWN & ROOT, INC., Relator.**

No. 03–1129.

Supreme Court of Texas.

Argued Dec. 1, 2004.

Decided May 20, 2005.

Jack G. Carnegie, John L. Hagan, Jones Day, Kevin B. Finkel, Johnson Finkel DeLuca & Kennedy, P.C., Houston, for relator.

Jeffrey Raizner, Doyle Raizner LLP, Jack F. Burleigh, Houston, Ira E. Hoffman, Grayson Kubli & Hoffman, P.C., McLean, Jeff H. Galloway, John Fellas, Hughes Hubbard & Reed LLP, New York, NY, for real party in interest.

Jeffery T. Nobles, Beirne Maynard & Parsons, L.L.P., Robert Bryan Tobor, Houston, Clint Alexander Corrie, Joseph Lawrence Mira, Bierne, Maynard & Parsons, LLP, Dallas, John D. White, Jones Walker Waechter Poitevent Carrere & Denegre, The Woodlands, for Gulf Coast Holdings Inc.

Chief Justice JEFFERSON delivered the opinion of the Court.

In this original proceeding, the question is whether Kellogg Brown & Root, Inc. ("KBR"), as a non-signatory to a contract containing an arbitration clause, must arbitrate its claims against Unidynamics, Inc. ("Unidynamics") and MacGREGOR (FIN) Oy ("MacGregor")—the signatories to the contract. The trial court denied MacGregor's motion, which sought to compel KBR to pursue its claims in an ongoing arbitration between MacGregor and Unidynamics. The court of appeals held that the trial court abused its discretion and conditionally granted mandamus relief, ordering the trial court to vacate its order denying MacGregor's motion and "issue an order compelling KBR to arbitrate all claims." 126 S.W.3d 176, 184. KBR sought mandamus relief in this Court.

Approximately two months after KBR filed its petition here, the arbitration between MacGregor and Unidynamics concluded. As a result, the relief MacGregor requested in the lower courts—that KBR be compelled "to pursue its claims in the arbitration between MacGregor (FIN) and Unidynamics"—is no longer available. The case is not moot, however, because the parties continue to dispute whether KBR should be compelled to "arbitrate all claims" pursuant to the court of appeals' order. *Id.* at 184. Because we conclude that KBR cannot be so compelled, we conditionally grant mandamus relief and order the court of appeals to vacate its order.

## I

### Factual Background

In October 1999, MacGREGOR (USA), Inc. contracted with Ingalls Shipbuilding, Inc. ("Ingalls") to build elevator trunks for two cruise ships. MacGREGOR (USA) assigned the contract to its sister compa-

ny, MacGREGOR (FIN) Oy[1] ("MacGregor"). In August 2000, MacGregor subcontracted part of the job to Unidynamics, which agreed to fabricate a set of the elevator trunks for one of the ships.[2] In June 2001, Unidynamics and KBR entered into a second-tier subcontract, under which KBR agreed to furnish labor, equipment, and facilities to fabricate the elevator trunks. In the fabrication subcontract between MacGregor and Unidynamics, the parties agreed that: "Any disputes arising from the interpretation or application of this contract including any document pertaining thereto, shall be settled by arbitration in accordance with General Conditions (ECE 188), (Appendix 10)."[3] The second-tier subcontract between Unidynamics and KBR did not contain an arbitration provision.

After the ship buyer declared bankruptcy in November 2001, Ingalls directed MacGregor to cease work and notify its subcontractors to do the same. MacGregor directed Unidynamics to comply with "the same instructions that Ingalls gave MacGregor." Unidynamics conveyed those instructions to KBR. On or around November 5, 2001, KBR ceased work, stored the elevator trunks and other equipment, and sent Unidynamics invoices for unpaid fabrication services and storage costs. Because KBR had not been paid in full, it asserted liens on the elevator trunk fabrications, parts, and other materials (the "collateral").

A dispute then arose between MacGregor and Unidynamics regarding who owned the collateral and who owed KBR for the fabrication services and storage costs. The dispute stemmed from MacGregor and Unidynamics' Agreement Concerning Passing of Title (the "Title Agreement"), executed on December 5, 2001, and fully incorporated into their fabrication subcontract. Among other things, the Title Agreement provided that full title to the collateral would pass irrevocably to MacGregor immediately after MacGregor made two payments to Unidynamics, which were to occur no later than December 19, 2001. The Title Agreement further required Unidynamics to release the collateral to MacGregor upon MacGregor's request. It is undisputed that MacGregor timely paid Unidynamics; however, Unidynamics asserted that the payments were ineffective to pass title to MacGregor. When MacGregor demanded that Unidynamics release the elevator trunks, Unidynamics refused. The collateral remained in KBR's possession.

## II

### Procedural Background

In May 2002, pursuant to the arbitration provision in the fabrication subcontract, MacGregor asked the International Chamber of Commerce ("ICC") to arbitrate its dispute with Unidynamics. Among other things, MacGregor sought: (1) damages for breach of contract by Unidynamics for failure to release the collateral, (2) a deter-

1. The term "Oy" for Finnish companies is an abbreviation of "osakeyhtiö" ("osake" means "share," "yhtiö" means "society"). See http://encyclopedia. laborlawtalk.com/Oy (last visited May 18, 2005, and available in Clerk of Court's file).

2. In October 2000, MacGregor and Unidynamics entered into another subcontract, under which Unidynamics agreed to preassem-

ble and install the elevator trunks. That subcontract is not at issue in this case.

3. The arbitration provision in ECE 188 provided: "Any dispute arising out of the Contract shall be finally settled, in accordance with the Rules of Conciliation and Arbitration of the International Chamber of Commerce ["ICC"], by one or more arbitrators designated in conformity with those Rules."

mination as to which defendant owned the collateral, and (3) a determination regarding MacGregor's proportionate responsibility for the storage costs KBR billed Unidynamics. Unidynamics filed an answer and asserted counterclaims. MacGregor and Unidynamics then commenced arbitration in Paris, France.

While the arbitration was proceeding, both MacGregor and Unidynamics demanded that KBR release the collateral. KBR refused the demands and, on September 17, 2002, filed suit against both companies in Harris County. KBR claimed that Unidynamics breached its contract and, in the alternative, that it was entitled to recover *quantum meruit* damages against Unidynamics and MacGregor. KBR also sued for declaratory relief to determine which defendant owned the collateral. Subject to the court's ruling on ownership, KBR sought a judicial declaration that it possessed valid constitutional and statutory liens against the collateral in its possession.[4] MacGregor answered and sought a temporary restraining order, temporary injunction, and permanent injunction directing KBR to release the collateral. Unidynamics opposed MacGregor's application, arguing that the court action should be abated because the collateral's ownership was "the very issue ... being arbitrated before the ICC." MacGregor, Unidynamics, and KBR then negotiated an agreement, which the trial court entered as an Agreed Order. Pursuant to that order, MacGregor agreed to post a $1,000,000 bond and, upon presentation of

the bond, KBR agreed to release the collateral to MacGregor.[5] MacGregor posted the bond on October 28, 2002.

Meanwhile, on October 18, 2002, MacGregor filed a motion to abate the state court proceedings pending its arbitration with Unidynamics or, in the alternative, to compel KBR to pursue its claims in the ongoing arbitration between MacGregor and Unidynamics. The trial court denied MacGregor's motion. On December 19, 2002, MacGregor filed an interlocutory appeal and a petition for writ of mandamus in the court of appeals, contending that the trial court abused its discretion. The court of appeals dismissed the interlocutory appeal as moot and conditionally granted mandamus relief, ordering the trial court "to vacate its order denying MacGregor's plea in abatement and motion to compel arbitration, to issue an order compelling KBR to arbitrate all claims, and to stay all proceedings pending arbitration." [6] 126 S.W.3d at 184–85.

On December 9, 2003, KBR petitioned this Court for a writ of mandamus. On February 4, 2004, while the petition was pending before us, the arbitration between MacGregor and Unidynamics concluded, and the ICC issued a final arbitration award. KBR does not contest that award.

## III

### Mootness

■ As a preliminary matter, we must decide whether the ICC's final arbi-

---

4. *See* Tex. Const. art. XVI, § 37; Tex. Bus. & Com. Code § 7.209.

5. The parties agreed that the bond would be enforceable and payable in Texas, and that it would "constitute an unconditional promise to pay upon demand accompanied by proof of Final Judgment adjudicating the validity and amount, if any, of [KBR's] lien or liens against ... the collateral."

6. As of the date of this opinion, the trial court has not acted on the court of appeals' orders. Proceedings have not resumed in the trial court since the court of appeals ordered a stay on January 9, 2003. *See* 126 S.W.3d at 180–81.

tration award moots this mandamus proceeding. A case becomes moot if a controversy ceases to exist between the parties at any stage of the legal proceedings, including the appeal. *Allstate Ins. Co. v. Hallman,* 159 S.W.3d 640, 642 (Tex.2005); *Bd. of Adjustment of San Antonio v. Wende,* 92 S.W.3d 424, 427 (Tex.2002); *Williams v. Lara,* 52 S.W.3d 171, 184 (Tex. 2001). This case stems from the lower courts' action on MacGregor's motion to "compel[ ] KBR to pursue its claims in the arbitration between [MacGregor] and Unidynamics." Because that arbitration is over, KBR can no longer be compelled to "join the arbitration." *See* 126 S.W.3d at 183 (concluding that the trial court abused its discretion by refusing to compel KBR to join the ongoing arbitration). The question, then, is whether this proceeding is moot.

■ A case is not rendered moot simply because some of the issues become moot during the appellate process. *See Allstate,* 159 S.W.3d at 642–43 (holding that a dispute concerning attorney's fees preserved a live controversy in an otherwise moot appeal); *Camarena v. Tex. Employment Comm'n,* 754 S.W.2d 149, 151 (Tex.1988) (same). In this case, the court of appeals ordered the trial court "to issue an order compelling KBR to arbitrate all claims." 126 S.W.3d at 184. Although it is no longer possible for KBR to join the Paris arbitration, the court of appeals' ultimate directive has no temporal component. It requires KBR to "arbitrate all claims."

The live controversy in this proceeding is whether KBR must arbitrate those claims that remain now that the arbitration between MacGregor and Unidynamics has concluded. KBR's petition consisted of: (1) a breach-of-contract claim against Unidynamics; (2) in the alternative, a *quantum meruit* claim against Unidynamics and MacGregor; and (3) a de-

claratory judgment action to determine the collateral's owner and to establish that KBR possessed valid liens. The arbitrator determined that, pursuant to the Title Agreement between MacGregor and Unidynamics, title to the collateral passed from Unidynamics to MacGregor on December 10, 2001. KBR is satisfied with this resolution of the ownership dispute, and thus, we need not address whether the ownership dispute must be arbitrated. Additionally, we need not address whether KBR should be compelled to arbitrate its claims against Unidynamics, because the parties now agree that those claims are not subject to arbitration. Our inquiry is accordingly limited to determining whether KBR must arbitrate its *quantum meruit* and lien-validity claims against MacGregor.

## IV

### Discussion

■ The parties do not dispute the court of appeals' holding that the arbitration provision at issue is governed by the Federal Arbitration Act ("FAA"). *See* 9 U.S.C. §§ 1–16; 126 S.W.3d at 181. In general, a party seeking to compel arbitration under the FAA must establish that: (1) there is a valid arbitration agreement, and (2) the claims raised fall within that agreement's scope. *In re FirstMerit Bank,* 52 S.W.3d 749, 753 (Tex.2001); *In re Oakwood Mobile Homes, Inc.,* 987 S.W.2d 571, 573 (Tex.1999). Doubts regarding an agreement's *scope* are resolved in favor of arbitration because there is a presumption favoring agreements to arbitrate under the FAA. *In re FirstMerit Bank,* 52 S.W.3d at 753; *Cantella & Co. v. Goodwin,* 924 S.W.2d 943, 944 (Tex.1996). However, "the presumption arises only after the party seeking to compel arbitration proves that a valid arbitration agreement exists," *J.M. Davidson, Inc. v. Webster,*

128 S.W.3d 223, 227 (Tex.2003), because "the purpose of the FAA was to make arbitration agreements as enforceable as other contracts, not more so." *Bridas S.A.P.I.C. v. Gov't of Turkm.*, 345 F.3d 347, 354 n. 4 (5th Cir.2003) (citations omitted); *see also E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 293, 122 S.Ct. 754, 151 L.Ed.2d 755 (2002) ("The FAA directs courts to place arbitration agreements on equal footing with other contracts....").

■■■ Under the FAA, ordinary principles of state contract law determine whether there is a valid agreement to arbitrate. *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995); *Wash. Mut. Fin. Group, LLC v. Bailey*, 364 F.3d 260, 264 (5th Cir.2004); *J.M. Davidson, Inc.*, 128 S.W.3d at 227–28; *In re Halliburton Co.*, 80 S.W.3d 566, 568 (Tex.2002). Because arbitration is contractual in nature, the FAA generally "does not require parties to arbitrate when they have not agreed to do so." *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 478–79, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989) ("Arbitration under the [FAA] is a matter of consent, not coercion...."), *quoted in E.E.O.C.*, 534 U.S. at 293–94, 122 S.Ct. 754; *see also Bridas*, 345 F.3d at 361 (citing J. Douglas Uloth & J. Hamilton Rial, III, *Equitable Estoppel as a Basis for Compelling Nonsignatories to Arbitrate—A Bridge Too Far?*, 21 Rev. Litig. 593, 632 (2002)). Federal and Texas state courts have recognized, however, that "[i]t does not follow ... that under the [FAA] an obligation to arbitrate attaches only to one who has personally signed the written arbitration provision"; instead, under certain circumstances, principles of contract law and agency may bind a non-signatory to an arbitration agreement. *Fisser v. Int'l Bank*, 282 F.2d 231, 233 (2d Cir.1960), *quoted in Int'l Paper Co. v. Schwabedissen*

*Maschinen & Anlagen*, 206 F.3d 411, 416 (4th Cir.2000), and *Thomson–CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir.1995); *see also Bailey*, 364 F.3d at 267 (quoting *Thomson–CSF*, 64 F.3d at 776); *In re FirstMerit Bank*, 52 S.W.3d at 755 (citing *Nationwide of Bryan, Inc. v. Dyer*, 969 S.W.2d 518, 520 (Tex.App.-Austin 1998, no pet.)); *S.W. Tex. Pathology Assocs. v. Roosth*, 27 S.W.3d 204, 208 (Tex. App.-San Antonio 2000, pet. dism'd w.o.j.).

Although state law determines the validity of an arbitration agreement, courts have applied both federal and state law to determine the related, but distinct, issue of whether non-signatory plaintiffs should be compelled to arbitrate their claims. *See, e.g., Bailey*, 364 F.3d at 267–68 (applying federal law); *Bridas*, 345 F.3d at 355–63 (applying federal law); *Fleetwood Enters. v. Gaskamp*, 280 F.3d 1069, 1074–77 (5th Cir.2002) (applying state law); *Roosth*, 27 S.W.3d at 208–09 (applying state law); *Dyer*, 969 S.W.2d at 520 (applying state law); *Lakeland Anesthesia, Inc. v. United Healthcare of La., Inc.*, 871 So.2d 380, 392–95 (La.Ct.App.2004) (applying federal and state law). The FAA does not specify whether state or federal law governs, and the United States Supreme Court has not directly addressed the issue.

Federal courts of appeals, however, have frequently applied federal substantive law when deciding whether a non-signatory must arbitrate. *See, e.g., Bailey*, 364 F.3d at 267 n. 6; *Bridas*, 345 F.3d at 355–63; *InterGen N.V. v. Grina*, 344 F.3d 134, 142–50 (1st Cir.2003); *Dominium Austin Partners v. Emerson*, 248 F.3d 720, 728 (8th Cir.2001); *Int'l Paper Co.*, 206 F.3d at 417 n. 4; *Thomson–CSF*, 64 F.3d at 778–79. The Fourth and Fifth Circuits have reasoned that " 'federal substantive law of arbitrability' ... resolve[s] this question," because the determination of whether a non-signatory is bound "presents no state

law question of contract formation or validity." *R.J. Griffin & Co. v. Beach Club II Homeowners Ass'n,* 384 F.3d 157, 160 n. 1 (4th Cir.2004) (quoting *Int'l Paper Co.,* 206 F.3d at 417 n. 4); *Bailey,* 364 F.3d at 267 n. 6 (same). We are not convinced that state law plays no role in making this determination. *See Roosth,* 27 S.W.3d at 208–09 (applying state law); *Dyer,* 969 S.W.2d at 520 (applying state law). Nevertheless, we are mindful of the extensive body of federal precedent that has explored the extent to which non-signatories can be compelled to arbitrate. Moreover, we recognize that it is important for federal and state law to be as consistent as possible in this area, because federal and state courts have concurrent jurisdiction to enforce the FAA. *See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). Our decision today rests on state law, but it is informed by persuasive and well-reasoned federal precedent.

Federal courts have recognized six theories, arising out of common principles of contract and agency law, that may bind non-signatories to arbitration agreements: (1) incorporation by reference; (2) assumption; (3) agency; (4) alter ego; (5) equitable estoppel, and (6) third-party beneficiary. *See, e.g., Bridas,* 345 F.3d at 356.[7] Here, MacGregor asserts that KBR is bound to arbitrate under the doctrine of "direct benefits estoppel"—a type of equitable estoppel that federal courts apply in the arbitration context. *See, e.g., Bailey,* 364 F.3d at 268; *Bridas,* 345 F.3d at 361–

62; *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.,* 269 F.3d 187, 199–201 (3d Cir.2001); *Int'l Paper Co.,* 206 F.3d at 418.[8]

▮▮▮▮▮ Under "direct benefits estoppel," a non-signatory plaintiff seeking the benefits of a contract is estopped from simultaneously attempting to avoid the contract's burdens, such as the obligation to arbitrate disputes. *R.J. Griffin & Co.* at 160–61; *Bailey,* 364 F.3d at 268; *Int'l Paper Co.,* 206 F.3d at 418 ("[T]he doctrine recognizes that a party may be estopped from asserting that the lack of his signature precludes enforcement of the contract's arbitration clause when he has consistently maintained that other provisions of the same contract should be enforced to benefit him."); *Thomson–CSF,* 64 F.3d at 778. Thus, a non-signatory plaintiff may be compelled to arbitrate if it seeks to enforce terms of a contract containing an arbitration provision. *See R.J. Griffin & Co.,* 384 F.3d at 161–64; *Bailey,* 364 F.3d at 268; *Bridas,* 345 F.3d at 361–62 ("Direct benefits estoppel applies when a non-signatory 'knowingly exploits the agreement containing the arbitration clause.' ") (quoting *E.I. DuPont de Nemours & Co.,* 269 F.3d at 199); *Int'l Paper Co.,* 206 F.3d at 418. For example, if a non-signatory's breach-of-warranty and breach-of-contract claims are based on certain terms of a written contract, then the non-signatory cannot avoid an arbitration provision within that contract. *See Int'l Paper Co.,* 206 F.3d at 418. If, however, a non-signato-

---

**7.** Most federal courts, however, list only five of these theories, omitting third-party beneficiary as a separate ground. *See Local Union No. 38, Sheet Metal Workers' Int'l Ass'n v. Custom Air Sys., Inc.,* 357 F.3d 266, 268 (2d Cir.2004); *Javitch v. First Union Sec., Inc.,* 315 F.3d 619, 629 (6th Cir.2003); *Fleetwood,* 280 F.3d at 1076; *Employers Ins. of Wausau v. Bright Metal Specialties, Inc.,* 251 F.3d

1316, 1322 (11th Cir.2001); *Bel–Ray Co. v. Chemrite (Pty) Ltd.,* 181 F.3d 435, 446 (3d Cir.1999); *Int'l Paper Co.,* 206 F.3d at 417; *Thomson–C.S.F.,* 64 F.3d at 776.

**8.** While not all federal courts use the phrase "direct benefits estoppel," we adopt that terminology from *Bridas* to describe this form of estoppel. See 345 F.3d at 361–62.

ry's claims can stand independently of the underlying contract, then arbitration generally should not be compelled under this theory. *See, e.g., R.J. Griffin & Co.,* 384 F.3d at 164; *Bridas,* 345 F.3d at 362.

Consistent with the federal doctrine of "direct benefits estoppel," this Court has held that a non-signatory plaintiff may be compelled to arbitrate if its claims are "based on a contract" containing an agreement to arbitrate. *In re FirstMerit Bank,* 52 S.W.3d at 755 ("[A] litigant who sues based on a contract subjects him or herself to the contract's terms."). In *FirstMerit Bank,* the non-signatory plaintiffs sued the signatory defendant for, among other things, breach of contract, revocation of acceptance, and breach of warranty. *Id.* at 752–53, 755. By bringing the breach-of-contract and breach-of-warranty claims, the plaintiffs sought benefits that stemmed directly from the contract's terms. We concluded that, by seeking to enforce the contract, the non-signatory plaintiffs "subjected themselves to the contract's terms, including the Arbitration Addendum." *Id.* at 756; *see also Roosth,* 27 S.W.3d at 208 ("The nonsignatory cannot enforce specific terms of the agreement while seeking to avoid the arbitration provision.").

The issue here is whether KBR sought to enforce terms of the fabrication subcontract by (1) bringing a *quantum meruit* claim against MacGregor, or (2) seeking a declaration that it possessed valid liens. We begin with *quantum meruit.*

 *Quantum meruit* is an equitable remedy that " 'is based upon the promise implied by law to pay for beneficial services rendered and knowingly accepted.' " *Vortt Exploration Co., Inc. v. Chevron U.S.A., Inc.,* 787 S.W.2d 942, 944 (Tex. 1990) (quoting *Truly v. Austin,* 744 S.W.2d 934, 936 (Tex.1988)). A party generally cannot recover under *quantum meruit* when there is a valid contract covering the services or materials furnished. *Murray v. Crest Constr., Inc.,* 900 S.W.2d 342, 345 (Tex.1995); *Woodard v. S.W. States, Inc.,* 384 S.W.2d 674, 675 (Tex.1964) ("Recovery on an express contract and on quantum meruit are inconsistent."). A party to a contract may, however, seek alternative relief under both contract and quasi-contract theories. Pleading in the alternative does not defeat the effect of an arbitration clause that broadly covers all disputes between signatories that arise out of the underlying agreement. But in this case, KBR is not a signatory to the fabrication subcontract between MacGregor and Unidynamics; therefore, the scope of that subcontract's arbitration clause does not answer whether KBR must arbitrate.

 To advance its estoppel theory, MacGregor contends that KBR's *quantum meruit* claim is "based on" the fabrication subcontract in the sense that KBR's labor and services were linked inextricably to that subcontract. It is true, of course, that KBR was fabricating trunks that were at the contract's core and that, in performing the work, KBR relied on the fabrication subcontract's specifications. However, under "direct benefits estoppel," a non-signatory plaintiff cannot be compelled to arbitrate on the sole ground that, but for the contract containing the arbitration provision, it would have no basis to sue. The work to be performed under a second-tier subcontract will inherently be related to and, to a certain extent, defined by contracts higher in the chain. *See* Black's Law Dictionary 1464 (8th ed.2004) (defining subcontractor as "[o]ne who is awarded a portion of an existing contract by a contractor, esp. a general contractor"). If this were a sufficient basis for binding a non-signatory subcontractor, arbitration agreements would become easier to enforce than other contracts, counter to the FAA's purpose. *See InterGen,* 344 F.3d at

145–46 (noting that federal courts have "been hesitant to estop a nonsignatory seeking to avoid arbitration").

■ We conclude that, under "direct benefits estoppel," although a non-signatory's claim may relate to a contract containing an arbitration provision, that relationship does not, in itself, bind the non-signatory to the arbitration provision. Instead, a non-signatory should be compelled to arbitrate a claim only if it seeks, through the claim, to derive a direct benefit from the contract containing the arbitration provision. *See Bailey*, 364 F.3d at 268; *MAG Portfolio Consult., GMBH v. Merlin Biomed Group LLC*, 268 F.3d 58, 61 (2d Cir.2001) ("The benefits must be direct—which is to say, flowing directly from the agreement."); *Int'l Paper Co.*, 206 F.3d at 417–18; *Thomson–CSF*, 64 F.3d at 778–79; *In re FirstMerit Bank*, 52 S.W.3d at 755.[9]

■ In its *quantum meruit* claim against MacGregor, KBR seeks payment for services rendered. KBR provided services pursuant to its contract with Unidynamics. KBR's asserted right to payment therefore stems directly from the KBR–Unidynamics contract, not the fabrication subcontract. The fabrication subcontract includes no provision for paying KBR. In fact, KBR is effectively precluded from asserting rights under that contract, which expressly provides that "Approved use of any subcontractor creates no contractual relationship between the subcontractor and [MacGregor]."[10] Thus, we conclude that the court of appeals abused its discretion to the extent it compelled KBR to arbitrate its *quantum meruit* claim against MacGregor.

■ Having determined that KBR's *quantum meruit* claim is not subject to arbitration, we turn to KBR's lien-validity claims. KBR sought a judicial declaration that it possessed valid constitutional and warehouseman's statutory liens. *See* Tex. Const. art. XVI, § 37; Tex. Bus. & Com. Code § 7.209(a)(1). The self-executing constitutional lien attaches to buildings and special-order articles that are made or repaired by mechanics, material men, and artisans who have a direct contractual relationship with the owner of the property. *See* Tex. Const. art. XVI, § 37; *CVN Group, Inc. v. Delgado*, 95 S.W.3d 234, 240 (Tex.2002) ("[F]or constitutional liens that

---

9. Federal courts have also applied "direct benefits estoppel" to bind "non-signatories who, during the life of the contract, have embraced the contract despite their non-signatory status but then, during litigation, attempt to repudiate the arbitration clause in the agreement." *E.I. DuPont de Nemours & Co.*, 269 F.3d at 200; *see also InterGen*, 344 F.3d at 146 (holding equitable estoppel theory inapplicable to non-signatory that did not seek to derive direct benefits from contracts "during their currency"); *Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 353 (2d Cir.1999) (holding non-signatory who received lower insurance rates and ability to sail under French flag due to contract was bound by arbitration clause within contract); *In re VMS Ltd. P'ship Sec. Litig.*, 26 F.3d 50, 52 (7th Cir.1994) (holding wife bound by arbitration clause that only her husband signed as she accepted benefits of in- vestment services). We do not reach this application of "direct benefits estoppel" here. MacGregor's argument for arbitration rests not on KBR's actions during the life of the fabrication subcontract, but on KBR's attempt to benefit from that contract through litigation.

10. *See MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 651 (Tex.1999) ("The intention to contract or confer a direct benefit to a third party must be clearly and fully spelled out or enforcement by the third party must be denied."); *City of LaPorte v. Taylor*, 836 S.W.2d 829, 831 (Tex.App.-Houston [1st Dist.] 1992, no writ) ("Generally, in construction contracts, in the absence of an express agreement to the contrary, a subcontractor is not in privity with the owner....").

are self-executing, there are no technical requirements...."); *First Nat'l Bank v. Whirlpool Corp.*, 517 S.W.2d 262, 268 (Tex. 1974) (holding that "the constitutional lien on manufactured chattels is available ... only upon articles made especially for a purchaser·pursuant to a special order and in accordance with the purchaser's plans or specifications"); *Hayek v. W. Steel Co.*, 478 S.W.2d 786, 790 (Tex.1972); *Strang v. Pray*, 89 Tex. 525, 35 S.W. 1054, 1056 (1896). The warehouseman's lien arises "against the bailor on the goods covered by a warehouse receipt or on the proceeds thereof in his possession for charges for storage or transportation ..., insurance, labor, or charges present or future in relation to the goods, and for expenses necessary for preservation of the goods...." Tex. Bus. & Com.Code § 7.209(a)(1); *see also Flores v. Didear Van & Storage Co.*, 489 S.W.2d 406, 407–09 (Tex.Civ.App.-Corpus Christi 1972, no writ) (discussing validity and enforceability of warehouseman's lien).

In this Court, MacGregor's sole argument for compelling arbitration of KBR's lien-validity claims is that the claims require a determination of ownership, and thus, they are "based on" the Title Agreement within the fabrication subcontract.[11] Ownership was, of course, a central issue before and during the Paris arbitration. When the arbitration award resolved the ownership dispute, it also eliminated the only rationale that MacGregor has assert-ed thus far for arbitrating the liens' validity.

We do not decide whether other arguments may exist to compel KBR to arbitrate the validity of its liens. To the extent a lien dispute still remains, the trial court is in the best position to determine, on principles we have declared today, whether it must be arbitrated.

## V

### Conclusion

We conditionally grant mandamus relief and order the court of appeals to vacate its order compelling KBR to "arbitrate all claims." *See* 126 S.W.3d at 184. The writ will issue only if the court of appeals fails to comply.

Justice JOHNSON did not participate in the decision.

---

11. KBR's petition included the following:

29. **Ownership.** Given the Defendants' competing claims known to Plaintiff by the Defendants, Plaintiff seeks a declaration from the Court as to which Defendant(s) possesses the ownership rights, title and interest in the elevator shaft fabrications, component parts and other materials....

30. **Constitutional Lien.** *Subject to the determination of ownership*, Plaintiff also seeks a judicial declaration that Plaintiff possesses a valid constitutional lien to the elevator shaft fabrications, component parts and other materials pursuant to Article 16, § 37 of the Texas Constitution.

31. **Statutory Lien.** *Subject to the determination of ownership*, Plaintiff also seeks a judicial declaration that Plaintiff possesses a valid statutory lien to the elevator shaft fabrications, component parts and other materials pursuant to § 7.209 of the Texas Business and Commerce Code.

(Emphasis added.)